IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                 Case No. 05-40114-01/02-SAC

MARLON A. WHITE, and
BRUCE A. RICHARDSON,

        Defendants.

MEMORANDUM AND ORDER

This case comes before the court on defendant White's motion to suppress (Dk. 44), defendant Richardson's motion to join his co-defendant's motions (Dk. 53), and defendant Richardson's pro se motion to dismiss (Dk. 40). The government has responded (Dk. 57), opposing all but the motion to join.  After having taken these motions under advisement at the conclusion of the evidentiary hearing held April 20, 2006, the court is ready to rule.

**Defendant Richardson's Motion to join**

The court grants as unopposed defendant Richardson's motion to join his co-defendant's motions.

**Motion to suppress**

Defendant White's motion to suppress and the related pleadings (Dk. 44, 45, 54) allege an illegal initial stop, an unconstitutional detention, a de facto arrest unsupported by probable cause, and an illegal search of the vehicle. Defendant Richardson has joined in the motion and has filed a supplemental brief.

**Facts**

On Sunday, October 2, 2005, Trooper Andrew Dean with the Kansas Highway Patrol was traveling westbound on I-70 in Riley County, Kansas on traffic patrol.  After observing a group of four or five vehicles traveling eastbound at approximately 70 m.p.h., he decided to turn around to conduct routine traffic enforcement.  He turned through the median,  accelerated to catch up to the group, then read the Nevada tag of an eastbound silver Cadillac.  He had no prior information about this vehicle or its inhabitants, *i.e.*, defendant White, the driver, and defendant Richardson, the sole passenger.  Trooper Dean learned from dispatch that the tag was assigned and that defendant's vehicle[1] was not stolen.

Soon thereafter Trooper Dean observed defendant's vehicle pass one of the other vehicles in the group, an SUV.  Defendant's vehicle moved from the right lane to the left, overtook the SUV, then pulled back into the right lane in front

---

[1]The court shall refer to the silver Cadillac as "defendant's vehicle" for ease of reference, although no contention is made that either defendant owned it.

of the SUV while traveling at approximately 70 m.p.h.  At the moment that defendant's vehicle returned to the right lane in front of the SUV, Trooper Dean saw the SUV apply its brakes lightly for an instant, as if to turn off its cruise control.  Trooper Dean estimated that there was a distance of two to three car lengths or approximately 30 to 40 feet between the two vehicles at the moment defendant's vehicle returned to the right lane.  Trooper Dean was approximately ten or twelve car lengths, or 150 to 180 feet, behind those two vehicles at the time. Trooper Dean believed that the SUV had applied its brakes to slow down and re-establish a safe and legal following distance behind defendant's vehicle.

Trooper Dean concluded that the lane change made by defendant's vehicle was illegal because it failed to leave a safe distance between the two vehicles upon returning to the right lane, and decided to stop defendant's vehicle for that offense.  Kansas law requires one to pass a car safely, but does not specify what distance is a safe distance.  Trooper Dean testified that a safe passing distance depends on how fast the vehicles are traveling.  Based on his training and experience, a safe distance is one car length between two vehicles for every ten miles of hour of speed they are traveling.  Thus for vehicles traveling 70 miles per hour, as here, a safe distance between the two vehicles is approximately seven car lengths.

Trooper Dean was also aware that the Kansas Driver's Handbook recommends that a passing driver not return to the right lane until he can see in his rear view mirror the entire front of the vehicle being passed.  Defendant's Exh. W-1, p. 17.  He was additionally aware of the "two-second recommendation" in that handbook, which provides that one vehicle following another should pass a fixed object no sooner than two seconds after the lead vehicle has passed that same object.  *See* Exh. W-1, p. 19.  Trooper Dean found defendant's passing to result in a "close call," which was "clearly unsafe," since the vehicles were one second apart instead of two, and were only two or three car lengths apart, instead of seven.

Trooper Dean then activated his emergency equipment on his patrol vehicle and initiated a traffic stop at approximately 6:50 p.m.  He contacted the two occupants, informed them why they had been stopped, and obtained the Indiana driver's license issued to Marlon A. White, Sr.  The passenger was later identified as Bruce A. Richardson.

During the initial contact, in response to Trooper Dean's questions, White stated that they had been in Las Vegas for a few days, had rented the vehicle there and were returning to Indianapolis.  Defendant White also provided Trooper Dean with the rental agreement he had signed.  Gvmt. Exh. 1.

Trooper Dean testified that he found White to be "very nervous"

4

throughout his initial contact with him.  Specifically, White moved around in his

seat as if he wanted to leave and his eyes were watery.  These indicia  of

nervousness did not subside throughout the stop.  Trooper Dean believed that

defendant's nervousness was greater in degree and in length than the nervousness

he routinely sees exhibited by mere traffic violators.  Trooper Dean believed that

passenger Richardson also appeared nervous because he looked down and

avoided eye contact whenever Trooper Dean tried to make eye contact with him.

Trooper Dean believed this was unusual, as in his experience, passengers in routine

traffic stops usually do not exhibit signs of nervousness.

Trooper Dean then returned to his patrol vehicle, examined the rental

agreement and relayed the driver's license information to dispatch.  The rental

agreement indicated that White had rented the vehicle the previous evening,

October 1, 2005, at the Las Vegas, Nevada Airport, and that the vehicle was to be

returned to the Las Vegas Airport the next evening, October 3, 2005.  Trooper

Dean found it highly unlikely that an individual would innocently rent a vehicle in

Nevada one day, drive it through Kansas to Indiana the next day, then drive the

vehicle back to Nevada the following day.  Based on his experience, a typical rental

period for a vacation or cross country trip is more than a few days.  Trooper

Dean's experience is that most people rent a vehicle for the full extent of their trip,

rather than extending the days stated in their original rental agreement.  Defendant's travel plans "made no sense" to Trooper Dean.

Trooper Dean then requested a criminal history check on White and completed a warning citation for an improper lane change.  Dispatch advised that White had a drug history for both cocaine and marijuana.  Trooper Dean found it suspicious that the defendants were coming from Las Vegas, a "big hub"for large amounts of narcotics, that they were traveling on I-70, a route often used for drug trafficking, and were headed to Indianapolis, a well-known distribution point on I-70.  Believing that he had reasonable suspicion of a narcotics violation, he then contacted Wabaunsee County Sheriff's Deputy Gollner, a drug canine handler, and asked him to respond to the scene with his certified drug detection dog.

At approximately 6:58 p.m., Trooper Dean re-initiated contact with White and Richardson, returned White's driver's license and rental agreement, and issued him a warning citation for an improper lane change.  Trooper Dean then attempted to clarify White and Richardson's travel plans, which he found to be "very bizarre."  Trooper Dean asked how long they had been in Las Vegas, and White stated approximately four days.  When asked how they had gotten to Las Vegas, White stated they had flown from Indianapolis to Las Vegas.  White stated he had rented the vehicle in Las Vegas and they were returning to Indiana where

6

White had to work on October 3, the next day.  When Trooper Dean asked how

they would return the rental car to Las Vegas, White said they would drive the

vehicle back to Las Vegas on October 4.   Defendants did not say how they would

return  to Indiana after driving the rental car back to Nevada.  During this

conversation, Trooper Dean observed that White remained nervous and acted as

though he wanted to hurry up and get going.  White's statements during this

contact increased Trooper Dean's suspicions.

Trooper Dean then told White to "have a safe one" and stepped away

from the door.  Trooper Dean testified that defendants were not actually free to go

at that point, but that he was attempting to establish a consensual encounter.  White

then put the vehicle into drive.  Trooper Dean re-approached White and asked if he

could ask a few more questions.  White nodded affirmatively.  Trooper Dean began

advising White that there were problems with drugs being transported on I-70, but

stopped because White appeared as though he did not want to answer anymore

questions.  Trooper Dean asked White: "You don't want me to ask you any

questions?"  White stated that he had to get back to work.  Trooper Dean then

asked: "You don't have any drugs in the car do you?"  White did not respond to

that question.  Trooper Dean understood from defendant's response that defendant

White did not want to stay, and did not consent to further detention.  Trooper Dean

believed that defendants were detained but not arrested during this conversation.[2]

At approximately 6:59 p.m., Trooper Dean instructed White and Richardson to stay where they were and advised them that he was going to have a drug detection dog conduct an exterior sniff of the vehicle. Trooper Dean then contacted Deputy Gollner again to see how close he was to Trooper Dean's location.  Deputy Gollner advised that it would save time if they could meet at the Kansas Department of Transportation Office.  That office is located approximately eight miles east of defendants' location on I-70, then ½ to 3/4 of a mile off I-70 on Highway K-99.

Trooper Dean decided to meet Deputy Gollner at the KDOT office to lessen the time defendants were detained, so instructed White to follow him to the KDOT Office for a canine sniff.[3]  When defendant White said something about getting back to work, Trooper Dean responded that the office was just eight miles up the road in their direction of travel, that he didn't want to hold defendants up anymore than he had to, and to just follow him to the office.  He testified that he

---

[2] During a series of rapid questions on cross-examination, Trooper Dean was asked whether defendants were under arrest during this encounter and he responded, "correct." He immediately clarified his belief that defendants were not under arrest at that time but were detained.

[3]The audio portion of the video tape is unclear throughout the conversations.

considered defendants to be detained but not arrested during this encounter, and would never permit a person under arrest to follow him in his own vehicle.

Trooper Dean left for the KDOT office at about 7:02 p.m., followed by defendant's vehicle. Soon after their departure eastbound to the KDOT Office, Trooper Dean noticed that White slowed down and failed to maintain a constant speed behind him.  Trooper Dean then saw defendant's vehicle turn into an improved median as if White were attempting to evade Trooper Dean by turning around and proceeding westbound on I-70. Trooper Dean immediately turned through the unimproved median, accelerated westbound on I-70, turned near defendant's vehicle, signaled for White to follow him, then proceeded eastbound again on I-70.  White saw the patrol car, backed up, then followed Trooper Dean eastbound on I-70 to the KDOT office without further event.

Trooper Dean, White, and Richardson arrived at the KDOT Office approximately five or ten minutes after Trooper Dean had initially told defendants to follow him.  Deputy Gollner arrived soon thereafter and deployed his certified drug canine, "Riko," who conducted an exterior sniff of the suspect vehicle. Deputy Gollner advised that Riko had indicated to the presence of narcotics in the suspect vehicle.  Trooper Dean then got the keys, searched in the passenger compartment of the vehicle, and opened the trunk where he immediately smelled

raw marijuana.  Three bundles of marijuana were found in the trunk approximately 25 to 35 minutes after the initial stop.  Trooper Dean testified that defendants were then placed under arrest and were transported to the Riley County Jail.

The vehicle was impounded because the rental agreement provided that the rental contract automatically terminates if the vehicle is used for illegal purposes, including the transportation of controlled substances.  Defendant's vehicle was towed to Blue Stem Auto in Alma, Kansas where it was secured pursuant to KHP practice.

Soon thereafter, a Drug Enforcement Administration (DEA) Task Force Officer informed Trooper Dean that defendant Richardson was known to distribute drugs in addition to marijuana, and encouraged Trooper Dean to search the vehicle more closely.  Therefore, on October 4, 2005, Trooper Dean conducted a second search of the suspect vehicle and found four kilograms of cocaine and cocaine base under its hood.

**Initial stop**

Defendants first challenge the initial stop of the vehicle.  Defendants' sole claim is that defendant White "was safely clear of the overtaken vehicle," so the stop was unjustified.  Dk. 45, p. 4.

A traffic stop is a seizure under the Fourth Amendment.  *United*

10

*States v. Taverna*, 348 F.3d 873, 877 (10th Cir. 2003). Routine traffic stops are analyzed under the investigative detention principles outlined in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998). The reasonableness of a traffic stop is a dual inquiry: (1) "whether the officer's action was justified at its inception," and (2) whether the officer's action "was reasonably related in scope to the circumstances that first justified the interference." *United States v. Burch*, 153 F.3d 1140, 1141 (10th Cir. 1998) (quotation omitted).

In deciding the validity of the initial stop, the court looks at whether it was "objectively justified." *United States v. Botero-Ospina*, 71 F.3d 783, 788 (10th Cir. 1995) (en banc), *cert. denied*, 518 U.S. 1007 (1996). To be valid, the officer must have either " '(1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." ' *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001) (quoting *United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999)). The constitutional reasonableness of a traffic stop does not depend on the officer's actual motive in conducting the stop. *Whren v. United States*, 517 U.S. 806, 812-13 (1996). Rather, the initial traffic stop is reasonable if the officer observed a traffic violation or has a reasonable articulable suspicion that a traffic or

11

equipment violation occurred.

The Tenth Circuit recently summarized the law relevant to the

reasonable suspicion standard, as applied to traffic stops, in stating:

> Reasonable suspicion requires that an officer provide "some minimal level of objective justification." *I.N.S. v. Delgado*, 466 U.S. 210, 217, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984). However, an officer with reasonable suspicion need not "rule out the possibility of innocent conduct" as long as the totality of the circumstances suffices to form "a particularized and objective basis" for a traffic stop. *United States v. Arvizu*, 534 U.S. 266, 277-78, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002) (citation omitted). Moreover, reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error. *See United States v. Walraven*, 892 F.2d 972, 974-75 (10th Cir. 1989) (quotation omitted). Finally, reasonable suspicion may rely on information less reliable than that required to show probable cause, *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990), and it need not be correct. *See United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001) (upholding a traffic stop based on a reasonable articulable suspicion that a cracked windshield substantially obstructed the driver's view-the standard required by statute-regardless of whether or not the crack actually constituted a violation of the law); *United States v. Allegree*, 175 F.3d 648, 650 (8th Cir. 1999) (upholding a traffic stop based on the mistaken, yet reasonable, belief that defendant had illegal headlights).

*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir.2004).

Trooper Dean stopped defendant for a violation of Kansas Statute

Annotated § 8-1516(a), which states:

> The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle.

12

Trooper Dean's testimony is uncontradicted and credible.  He testified that the relevant vehicles were traveling approximately 70 miles per hour, that he understood that for safety purposes there should be seven car lengths or two seconds between vehicles traveling at that speed, that he observed just two or three car lengths or one second separating the two vehicles, and that the passed vehicle had to apply its brakes to establish a safe distance.  His assessment of the speed the two vehicles were traveling, the distance between the two vehicles when defendant's vehicle reentered the right side of the roadway, the distance necessary for safety purposes between vehicles traveling at that speed, and that the passed vehicle applied its brakes when defendant's vehicle reentered the lane in front of it to reestablish a safe distance between the two vehicles, has not been shown to be erroneous or unreasonable.  These facts support a reasonable suspicion that defendant's vehicle was not "safely clear" of the overtaken vehicle within the meaning of that term as used in this statute.  The initial stop was therefore justified.

**Scope of Detention**

Defendants next challenge the scope of the detention.  Defendants claim that any detention beyond the time when Trooper Dean returned defendant

White's driver's license and rental agreement was illegal.  Dk. 45, p. 4.[4]

An officer is required to release a driver upon issuing a citation or returning paperwork, absent consent or reasonable suspicion.

Once an officer has requested relevant documentation, run a computer check, and issued a citation, he or she must allow a driver to continue without additional delay or questioning unless "during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity" or "the driver voluntarily consents to the officer's additional questioning." *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994).

*United States v. Carel*, 133 Fed. Appx. 497, 498, 2005 WL 1245009, *1 (10th Cir. 2005).  Consent is not alleged in this case.  Instead, the government contends Trooper Dean had a reasonable suspicion of criminal activity when he returned the paperwork, justifying the extended length of the stop.  *See United States v. Wallace,* 429 F.3d 969, 974 (10th Cir. 2005).

The reasonable suspicion standards are well established.

An officer conducting a traffic stop must point to "specific and

---

[4]Defendants do not claim that their detention before that point in time exceeded the scope or length of the stop.  *See Muehler v. Mena*, 544 U.S. 93 (2005) (questioning which does not extend the stop " 'beyond the time reasonably required to complete [the stop's original purpose]' is not unconstitutional, regardless of the content of the questions.); *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005) (same); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259-60 (10th Cir. 2006) (questions that extend the length of detention by only a brief time do not make the detention unreasonable).

articulable facts and rational inferences drawn from those facts" that give rise to a reasonable suspicion of criminal activity in order to extend the detention of a driver. *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994) (quotation omitted).  "We determine whether reasonable suspicion exists by assessing the totality of the circumstances."  *Id.*  We defer to "a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances," *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997), "remembering that reasonable suspicion represents a 'minimum level of objective justification' which is 'considerably less than proof of wrongdoing by a preponderance of the evidence.' "  *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)).

*United States v. Carel*, 133 Fed. Appx. 497, 499, 2005 WL 1245009, *2 (10th Cir. 2005); *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259-60 (10th Cir. 2006).

Implausible travel plans can contribute to reasonable suspicion.  *See Carel*, 133 Fed. Appx. 497.  As the Tenth Circuit recently held:

We agree that it was implausible that an unemployed New Yorker would innocently drive to California from New York, visit there for less than two days, purchase a vehicle (giving a California address for the registration), and then drive back.  Deputy Schneider thus had reasonable suspicion to detain Mr. Alcaraz-Arellano for further investigation after returning his license and registration.  *See United States v. Santos*, 403 F.3d 1120, 1129 (10th Cir. 2005) ("Implausible travel plans can contribute to reasonable suspicion."); *United States v. McRae*, 81 F.3d 1528, 1534-35 (10th Cir. 1996) (apparent contradiction between dates on defendant's car rental agreement and alleged travel plans contributed to reasonable suspicion); *United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir.1995) (officer had reasonable suspicion to detain motorist in part because he "did not find it plausible that Defendant would drive from California to North Carolina merely to take a very dilapidated sofa to some friends").

*Alcaraz-Arellano*, 441 F.3d at 1260.

        Prior criminal history involving drugs can contribute "powerfully" to reasonable suspicion, although insufficient by itself.  As the Tenth Circuit recently stated:

> ...this Court has held that a prior criminal history is by itself insufficient to create reasonable suspicion. *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir. 1994).  Even people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches.  But in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus.  *Id.*; *see also McRae*, 81 F.3d at 1535-36.

*United States v. Santos,* 403 F.3d 1120, 1132 (10th Cir. 2005).

        Extreme nervousness is also an appropriate factor to consider in determining reasonable suspicion.  The Tenth Circuit has consistently held that nervousness is "of limited significance" in determining whether reasonable suspicion exists.  *See United States v. Wald*, 216 F.3d 1222, 1227 (10th Cir. 2000).  Extreme and continued nervousness, however, "is entitled to somewhat more weight."  *United States v. West*, 219 F.3d 1171, 1179 (10th Cir. 2000).  Although "[n]ervousness alone cannot support reasonable suspicion of criminal activity," *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) (citing *United States v. Fernandez*, 18 F.3d 874, 880 (10th Cir. 1994)), it is one factor that the court should consider in reviewing the totality of the circumstances.  *See*

*West*, 219 F.3d at 1179, *Carel*, 133 Fed. Appx. at 499.

An officer's knowledge that a vehicle is traveling from a known drug source location to a known drug destination on a known drug route is a factor, albeit a weak factor, in finding suspicion of criminal activity. Santos, 403 F.3d at 1132. This is because police testimony has identified an extremely broad range of known drug source areas. *United States v. Williams*, 271 F.3d 1262, 1270 (10th Cir. 2001), *citing United States v. Nicholson*, 144 F.3d 632, 638 (10th Cir. 1998) (identifying the entire West Coast as a drug source area); *United States v. Scarborough,* 128 F.3d 1373, 1378 (10th Cir. 1997) (Colorado).

At the time he returned defendant's paperwork, Trooper Dean had learned of defendant's travel plans, which, in conjunction with the rental agreement, are extremely unusual and implausible.[5] This factor is weighty in this case. He also knew of defendant White's criminal history of cocaine and marijuana offenses, a significant factor.

Trooper Dean also found defendants' nervousness to be extreme,

---

[5]Although testimony was given that defendant's travel plans were suspect due to the dates of the rental agreement and the length of the trip, no testimony was offered that the use of a rental car, as opposed to a personal vehicle, factored into Trooper Dean's reasonable suspicion. *Compare., United States v. Figueroa-Lopez*, 125 F. 3d 1241, 1244 (9th Cir. 1997) (expert testimony that use of a rental car was consistent with the practices of an experienced drug trafficker); *United States v. Williams*, 271 F. 3d 1262, 1270 (10th Cir. 2001).

unusual and continued, and found it suspicious that defendants were coming from a "big hub" for large amounts of narcotics, were traveling on a route often used for drug trafficking, and were headed to a well-known drug distribution point. Although these factors may be weak, see *United States v. Williams*, 271 F.3d 1262, 1270 (10th Cir. 2001), they need not be ignored.

These facts are collectively sufficient under the circumstances of this case to produce a particularized and objective basis for suspecting the defendants of criminal activity, justifying the extension of the detention for a reasonable time until the drug dog sniff occurred.  *See Williams*, 271 F.3d at 1270; *Kopp*, 45 F.3d at 1453-54; *United States v. Morales-Zamora,* 914 F.2d 200, 203 (10th Cir. 1990).

From the times reflected on the video tape and the uncontradicted testimony, the court calculates that defendants were detained fifteen or twenty minutes from the time Trooper Dean returned their documents[6] to the time the drugs were found in the trunk.  Prior to that time, the drug dog had alerted, providing probable cause for the search.  *See United State v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993).  The court finds this to be a reasonable period of time

_____

[6]Trooper Dean's indication to defendants that they were free to leave bears no significance in the court's determination of whether the officer had reasonable suspicion to detain defendants.  *See United States v. Williams*, 271 F.3d 1262, 1271 (10th Cir. 2001).

and thus upholds the detention prior to defendants' formal arrest.  *See United States v. Villa-Chaparro*, 115 F.3d 797, 802-03 (10th Cir.), *cert. denied*, 522 U.S. 926 (1997) (extended detention of almost forty minutes spent waiting for a drug-sniffing dog did not violate the Fourth Amendment); *United States v. Garcia*, 52 F. Supp. 2d 1239 (D.Kan. 1999) (finding a delay of 40 minutes not unreasonable where supported by reasonable suspicion, even where the driver was being detained against his will).

**De facto arrest**

Defendants next contend that Trooper Dean engaged in a de facto arrest without probable cause  by compelling them to drive to the Department of Transportation office for the purpose of a canine search.  The government responds that defendants were not arrested until after the canine alerted to the presence of narcotics and the marijuana was found in defendant's vehicle at the DOT office, providing probable cause.

The line between an investigatory detention and a de facto arrest "is difficult to draw and is determined based on the facts of each case."  *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir. 1984).  As the Tenth Circuit recently stated, it is the highly intrusive nature of the event which distinguishes an investigative detention from an arrest.

19

> An arrest is distinguished by the involuntary, "highly intrusive" nature of the encounter. *Oliver*, 209 F.3d at 1186. "[T]he use of firearms, handcuffs, and other forceful techniques" generally exceed the scope of an investigative detention and enter the realm of an arrest. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994).

*Cortez v. McCauley,* 438 F.3d 980, 989 (10th Cir. 2006). *See Cooper*, 733 F.2d at

1363 (An arrest is "characterized by highly intrusive or lengthy search or

detention.")

An officer is generally permitted to detain an individual until the

investigation is completed. *Oliver v. Woods,* 209 F.3d 1179, 1189 (10th Cir. 2000).

*See United States v. Trimble*, 986 F.2d 394, 397-98 (10th Cir.) (where a passenger

in a car lawfully stopped by the police attempted to leave the area over the

objection of the police officer, the court held the subsequent detention reasonable

and the intrusion minimal), *cert. denied*, 508 U.S. 965 (1993).

The court is aware of  Tenth Circuit cases holding that a defendant,

pulled over for speeding, is arrested for Fourth Amendment purposes when the

trooper tells him to follow the trooper in his truck to the sheriff's office.  In *United*

*States v. Arango*, 912 F.2d 441, 443 (10th Cir. 1990), the officer retained Arango's

license and vehicle registration and told Arango that he had to follow him seven

miles to the sheriff's office to post bail for the traffic citation.  At the suppression

hearing, the officer admitted that this request was a pretext and that the real reason

that he asked Arango to return to the sheriff's office was to continue searching the truck.  Arango drove to the sheriff's office with one officer in front of him and another following him.  912 F.2d at 443.

The Court held that the detention became an arrest when the officer instructed Arango to follow him to the sheriff's office, citing cases to the same effect.

Once the police told Arango to come with them to the sheriff's office, the line between detention and de facto arrest was crossed.  *See United States v. Gonzalez*, 763 F.2d 1127, 1132 (10th Cir. 1985) (where police officer, while holding driver's license, registration, and title, asked defendant to go to police station, "defendant had no reasonable choice other than to accompany the officer no matter how polite the officer was in phrasing the request"); *United States v. Recalde*, 761 F.2d 1448, 1452 (10th Cir. 1985) (defendant was arrested where police still held license, registration, and speeding ticket and defendant drove to police station, sandwiched between two police cars, for further questioning).

*Arango*, 912 F.2d at 447.  *See Hayes v. Florida*, 470 U.S. 811 (1985); *United States v. $83,900.00 in U.S. Currency*, 774 F. Supp. 1305, 1319 (D. Kan. 1991) (finding defendant was arrested when the officer caused him to drive to the Highway Patrol office where he was detained for investigative purposes.)

The court does not believe that these cases establish a bright line rule that a detention becomes an arrest when an officer instructs a person to follow him to a law enforcement office.

No bright line divides the point at which an investigatory stop becomes an unlawful detention." *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989) (citing *United States v. Sharp*, 470 U.S. 675, 685, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605 (1985)). "A police officer's conduct during a stop is evaluated according to whether the duration of the stop was reasonable, whether the detained person had the ability to leave or end the encounter, and whether the detained person was transported during the period of detention." *Id.* (citing *Florida v. Royer*, 460 U.S. 491, 504-06, 103 S. Ct. 1319, 1328-29, 75 L. Ed. 2d 229 (1983)).

*U.S. v. $83,900.00 in U.S. Currency,* 774 F. Supp. 1305, 1319 (D. Kan. 1991).

Instead, the totality of the circumstances must be examined to determine whether a restraint on freedom of movement is of the degree associated with a formal arrest.

"There is no scientifically precise formula that enables courts to distinguish between investigatory stops ⋯ and ⋯ 'de facto arrests'." *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir. 1994). The "ultimate inquiry," however, is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) (internal quotations and citations omitted). In assessing whether there was a "restraint on freedom of movement," "a court must examine all the circumstances surrounding the interrogation." *Ventura*, 85 F.3d at 711 (internal quotations and citation omitted). This is an objective test: "the only relevant inquiry is 'how a reasonable man in the suspect's shoes would have understood his situation.' The subjective beliefs held by the interrogating officer or the person being interrogated are not germane." *Id.*, quoting *Stansbury v. California*, 511 U.S. 318, 324, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994).

*United States v. Trueber*, 238 F.3d 79, 93 (1st Cir. 2001). *See United States v. Anglin*, 438 F.3d 1229, 1231 (10th Cir. 2006) ("Whether someone is in custody is

an objective determination based upon what a reasonable person would sense. *United States v. Rogers*, 391 F.3d 1165, 1170 (10th Cir. 2004).")

Trooper Dean admits he instructed defendants to follow him to another location. His stated purpose in directing White to follow him to the KDOT Office was so their detention would be shorter and defendants, if innocent, could be on their way sooner. Trooper Dean testified that had the defendants been under arrest prior to the trip to the KDOT Office, he would not have allowed them to follow him in a private vehicle. Trooper Dean also admits that he would have given chase had defendants attempted to flee while en route to the KDOT office. When defendants began an evasive maneuver into the median, Trooper Dean immediately turned through an unimproved median and took action to enforce his instruction that defendants follow him to the DOT office.

The present case defies application of any bright line rule and is distinguishable from *Arango* in several respects. First, Trooper Dean had returned defendant White's documents to him before instructing defendant to follow him. A driver in possession of his own driver's license and rental agreement would feel more free to leave than one whose documents are retained by an officer. Secondly, Trooper Dean's stated intent in meeting the drug dog handler at the DOT rather than on location was to shorten the length of defendants' detention. That reason

23

has not been shown to be pretextual or to disadvantage defendants. Thirdly, defendants were not sandwiched in between two law enforcement vehicles while en route to the DOT, but had some freedom of movement and exercised it. Lastly, the court finds it reasonable for Trooper Dean to have required defendants to travel to the KDOT office since it was on the same route and in the same direction of defendant's intended travel, but for ½ to 3/4 of a mile one way.

The court finds that the instruction to follow the trooper to another location was for the convenience of the defendants. Had the trooper not asked them to travel to another location, defendants would have been detained for a longer period of time on I-70, based upon reasonable suspicion. The duration of the stop was reasonable, and defendants were not transported by officers during the period of detention. No use of firearms, handcuffs, boxing in by patrol cars, or other forceful techniques of an intrusive nature have been shown which characterize an arrest. Under these circumstances, the court finds that the character of the detention did not change to an arrest by virtue of the instruction for defendants to follow the trooper to the KDOT office or by any events which occurred prior to defendants' formal arrest.[7]  *Cf United States Maio*, 182 F. Supp. 2d 1025 (D. Kan.

---

[7]Defendants do not contend that a de facto arrest occurred at any point before the trooper instructed them to drive elsewhere. *See* Dk. 45, p. 6.

2001) (officer's order for defendant to move vehicle from interstate to another location for safety reasons did not change the character of the stop from an investigative detention to an arrest.)

Assuming, arguendo, that defendants' detention became a de facto arrest at the moment Trooper Dean turned around in the median and indicated by his actions that defendants were not free to leave and he would give chase if they tried to do so, no Fourth Amendment violation has been shown.   When Trooper Dean observed defendants slow down and begin to turn through the median, Trooper Dean had probable cause to believe that defendants willfully failed or refused to comply with his lawful order or traffic control direction that they follow him, in violation of  K.S.A. § 8-1503.[8]  *See  Oliver v. Woods,* 209 F.3d 1179, 1189 (10th Cir. 2000).

### Second search of vehicle

Defendants do not mount an independent challenge to the first search of the vehicle, claiming only that it was fruit of the poisonous tree.  Defendants do challenge the second search of the vehicle, which occurred on October 4, 2005,

---

[8]That statute states:  "No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer or fireman invested by law with authority to direct, control or regulate traffic. Violation of this section is a misdemeanor."

while the vehicle was impounded.

### Standing

The court first examines the government's contention that neither defendant has standing to challenge the second search. In analyzing whether a particular defendant has standing, a court must determine "whether the challenged search or seizure violated the Fourth Amendment rights of [the] criminal defendant who seeks to exclude the evidence" *Rakas v. Illinois*, 439 U.S. 128, 140 (1978). Courts typically look at two factors in deciding this question: (1) whether the defendant manifested a subjective expectation of privacy in the area searched; and (2) whether society would recognize that expectation as objectively reasonable. *United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).  A defendant bears the burden of proving both these factors.  *Katz v. United States*, 389 U.S. 347, 359 (1967).

Generally, a driver of a rented vehicle who is named on the rental agreement either as the renter or as an authorized driver has standing to challenge the search of the vehicle, because he has a reasonable possessory  interest in the vehicle, which gives rise to a reasonable expectation of privacy.  *See United States v. Roper*, 918 F.2d 885, 887 (10th Cir. 1990).  Defendant White, who was driving, is named on the rental agreement as the renter.  *See* Gvmt. Exh. 1.

The government nonetheless contends that Defendant White lacks standing because the terms of his rental contract provide that White's rental is "automatically terminated" when the vehicle is used "for an illegal purpose, including the transportation of a controlled substance or contraband." Gvmt Exh. 3, para. 16. The government contends that a person who rents a vehicle has no reasonable expectation of privacy in the vehicle is used, as here, for illegal purposes and the rental agreement expressly prohibits any use of the vehicle for illegal purposes, citing *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir. 1990) (citing *United States v. Obregon*, 573 F. Supp 876, 879-80 (D.N.M. 1983), *aff'd on other grounds*, 748 F.2d 1371 (10th Cir. 1984)).

The case relied upon by the government to support this proposition is not persuasive. *Boruff* denied standing to a driver of a rental vehicle on two grounds: 1) because he was not the renter of the vehicle or an authorized driver of it; and 2) the driver knew the rental agreement expressly forbade any use of the vehicle for illegal purposes. *Boruff*, 909 F.2d at 117. The first reason is independently sufficient to deny standing and it is unclear whether the court placed any weight whatsoever upon the second factor or whether it is merely superfluous. No case has been found which denies standing based solely on the latter reason. White signed the rental agreement and is its authorized driver and no showing has

27

been made that he knew the rental agreement would terminate if the vehicle were used to transport drugs.  The ultimate determination whether the vehicle was used for such a purpose will not be made until the verdict is reached or another resolution of the case is made.  The government's challenge to White's standing fails.

Defendant Richardson, however, did not rent the suspect vehicle and was not an authorized driver of the vehicle.  *See* Gvmt.  Exh. 1.  As a mere passenger, he had no reasonable expectation of privacy in the rental car and lacks standing to challenge its search.  *See United States v. Edwards*, 242 F.3d 928, 936 (10th Cir. 2001); *United States v. Shareef*, 100 F.3d 1491,1499-500 (10th Cir. 1996).

Defendants properly contend that they have standing to challenge a vehicle search in which the evidence is discovered as the fruit of an unlawful detention.  *See United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162-64 (10th Cir. 1995).  Because the court has found that defendants were not unlawfully detained, this argument fails.  *See generally United States v. Miller*, 84 F.3d 1244, 1250 (10th Cir. 1996).

**Merits**

Defendant White contends solely that this search was not incident to

28

arrest, since the search was temporally and geographically remote from his arrest. The government does not attempt to justify its search on October 4 based upon the search incident to arrest exception to the warrant requirement.  Instead, the government shows the court that the search was pursuant to probable cause provided by the dog alert.  *See  United States v. Rosborough*, 366 F.3d 1145, 1152 (10th Cir. 2004) (holding dog alert on vehicle creates probable cause to search the vehicle for drugs).

The fact that the impounded vehicle was searched a second time is not remarkable.  "There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure." *United States v. Johns,* 469 U.S. 478, 484 (1985).  Once a lawful search of a vehicle is conducted, police can later search the vehicle again. *See United States v. Casares-Cardenas*, 14 F.3d 1283, 1287 (8th Cir.), *cert. denied*,  513 U.S. 849 (1993) (upholding second search of impounded vehicle based on tip received two months after initial search).  "[O]nce the basis for the warrantless search has been established, requiring it to be done immediately or within some narrow time limit might result in a more intrusive search than either necessary or desirable in a free society." *Id.* The court finds no merit to defendant's challenge to the second search of the vehicle.

**Defendant Richardson's Pro Se Motion to Dismiss** (Dk. 40)

The court next addresses defendant Richardson's pro se motion to dismiss the indictment.  The court notes that this motion was filed at a time defendant was represented by counsel, and cautions defendant against filing pro se motions when he is represented by counsel.  *See Tarter v. Hury*, 646 F.2d 1010, 1014 (5th Cir. 1981) (holding that in the absence of extraordinary circumstances, a criminal defendant represented by counsel does not have a constitutional right to file every pro-se motion he wants to file in addition to his attorney's motions); *United States v. Price*, 2004 WL 2005790, *5 (D. Kan. 2004).  Because defendant's counsel has asked the court to submit this motion on the briefs, the court will consider this motion to be adopted by counsel, rather than deny it on the ground that defendant is represented by counsel and cannot file pro se motions. *Compare  United States v. Scheckel*, 1992 WL 401747, *1 (D. Kan. 1992) (giving the defendant a choice to refile pro se motion through counsel, or to waive counsel and proceed pro se).

Defendant Richardson asserts that the Superseding Indictment is defective because Counts 1 and 4 involve cocaine base (crack cocaine), which he asserts is not mentioned in the Controlled Substances Act and has not been properly scheduled as a Schedule II controlled substance.

Although it does not appear that the Tenth Circuit has addressed this

issue, this assertion has been consistently rejected by other jurisdictions which have

examined the issue.  As stated by the Sixth Circuit:

> [C]ontrary to [defendant's] argument, crack cocaine is covered by Schedule
> II of the Controlled Substances Act.  Under 21 U.S.C. § 802(6), a controlled
> substance is defined as "a drug or other substance, or immediate precursor,
> included in schedule I, II, III, IV, or V of part B of this subchapter."
> Schedule II lists "[c]oca leaves ...; cocaine ...; or any compound, mixture, or
> preparation which contains any quantity of any of the substances referred to
> in this paragraph."  *See* 21 U.S.C. § 812, Schedule II(a)(4); *see also* 21
> C.F.R. § 1308.12(b)(4) (listing in schedule II "[c]oca leaves [ ] and any salt,
> compound, derivative or preparation of coca leaves (including cocaine ...
> and [its] salts, isomers, derivatives and salts of isomers and derivatives), and
> any salt, compound, derivative, or preparation thereof which is chemically
> equivalent or identical with any of these substances").  Because cocaine base
> and crack cocaine are mixtures that contain cocaine and are derived from
> coca leaves, *see United States v. Canales*, 91 F.3d 363, 366-69 (2d Cir.
> 1996) (describing chemical composition of cocaine base and crack cocaine),
> these substances are encompassed by schedule II's definition. Several courts
> have held that crack cocaine is included within § 812(a)(4). *United States v.
> Manzueta*, 167 F.3d 92, 93-94 (1st Cir. 1999); *United States v. Sloan*, 97
> F.3d 1378, 1381-82 (11th Cir.1996); *United States v. Deisch*, 20 F.3d 139,
> 149-52 (5th Cir. 1994).

*United States v. Jernigan*, 93 Fed.Appx. 775, 776 -777 (6th Cir. 2004).  Because

the court believes that the Tenth Circuit would rule the same way, this motion shall

be denied.

IT IS THEREFORE ORDERED that defendant Richardson's motion

to join (Dk. 53) is granted, that defendant Richardson's pro se motion to dismiss

(Dk. 40) is deemed to be adopted by counsel and is denied, and that defendants'

motion to suppress (Dk. 44) is denied.

Dated this 17th day of May, 2006, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge